IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Harry and Anna Marie McKenna,   :
          Appellants   :
                          :
          v.                 :     No. 581 C.D. 2021
                          :     Argued: April 9, 2024
Commonwealth of Pennsylvania,   :
Department of Transportation     :

BEFORE:       HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE STACY WALLACE, Judge
                HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION
BY SENIOR JUDGE LEAVITT           FILED:  June 25, 2024

Harry and Anna Marie McKenna (Condemnees) appeal an order of the Court of Common Pleas of Philadelphia County (trial court) dismissing their petition for the appointment of a board of viewers for a *de facto* condemnation of their property located at 2644 East Juniata Street in Philadelphia.  The trial court held that because the Pennsylvania Department of Transportation (PennDOT) was reconstructing a highway ramp within the bounds of the easement it acquired in 1972 from prior owners of Condemnees' property, their petition did not state a claim.  Condemnees argue that the trial court erred because the current project constitutes new construction not covered by the existing easement.  Upon review, we affirm.

## Background

In August of 1972, PennDOT filed a declaration of taking to acquire an aerial and surface easement, unlimited in vertical dimension, for the construction of the I-95 Betsy Ross Interchange.  The easement was acquired from Evelyn M. Lisbon, the then-owner of 4185 East Thompson Street in Philadelphia.

Supplemental Reproduced Record at 48b (S.R.R. __).[1]  The declaration of taking provided as follows:

> Where the estate to be acquired is limited to an aerial easement plus a surface easement unlimited in vertical dimension for the accommodation of piers and other appurtenances, the following limitations shall be imposed on the use of the property beneath the area affected by the aerial easement.
>
> . . . .
>
> > (5) No interference shall be made with the right which is in the Commonwealth of Pennsylvania, to enter upon the property beneath the area affected by the aerial easement, for the purpose of inspection, maintenance, repairs, reconstruction or alteration of the structure and other appurtenances.

S.R.R. 74b.  Additionally, the plan included the following:

> The aerial easement to be acquired between stations 33 + 75.0 and 38 + 23.0 Ramp B and stations 33 + 77.0 and 38 + 48.0 Ramp H includes a surface easement unlimited in vertical dimension for the accommodation of piers and other appurtenances *and a temporary easement for construction and for storage of materials during construction*.

S.R.R. 73b (emphasis added).  The declaration also stated that the temporary easement would allow for construction but stated that it would "revert to the property owner upon the acceptance of the project by [PennDOT]."  S.R.R. 74b.

Later, the property at 4185 East Thompson Street was subdivided into three parcels, including the subject parcel at 2644 East Juniata Street in Philadelphia,

---

[1] On June 26, 1973, a notice of amendment to condemnation was recorded that reduced the area condemned and restated that the area acquired had "limited access to an aerial easement plus a surface easement unlimited in vertical dimension for the accommodation of piers and other appurtenances between Stations 36 + 58 and 38 + 48 on Ramp H."  S.R.R. 48b.

Pennsylvania (Property). On November 26, 2007, Condemnees purchased the Property, and their deed described PennDOT's easement as follows:

> Thence along the same and partially along Lots #17, 18, 19 and through the access ramp [right-of-way] off the Betsy Ross Bridge South 57 degrees 35 minutes 37 seconds West the distance of 178.167 feet to a point on the Northeasterly side of Berkshire Street (22 feet wide stricken from City Plan); Thence along the same and through the access ramp [right-of-way] off the Betsy Ross Bridge, North 32 degrees 24 minutes 23 seconds West the distance of 50.000 feet to a point a rear corner of Parcel "A[.]"

S.R.R. 67b.

Sometime thereafter, PennDOT began a multiyear project to reconstruct I-95. At the Betsy Ross Interchange, PennDOT will remove the existing ramp, piers, beams, and bridge deck and replace it with a new ramp in the same location, including that portion of the access ramp spanning Condemnees' Property. The replacement piers will be located in a slightly different location within the Property's easement area.

On May 28, 2019, PennDOT notified Condemnees that construction on or near their Property was scheduled to begin in Spring 2020.[2] On May 14, 2020,

---

[2] The letter stated, in pertinent part, as follows:

> Your property has been identified as either having an existing aerial highway easement, or otherwise as being near to proposed construction at the I-95 Betsy Ross Interchange. This letter is to invite you to a project update meeting on **June 20, 2019 at anytime between 5:00 and 7:00 PM**, at the I-95 project office located in the Arsenal Business Center at 2275 Bridge Street, in Bridesburg . . . .

> Construction is currently anticipated to begin in Spring 2020. At this meeting PennDOT will discuss the construction phasing and anticipated schedule for the project. The project includes replacement of the bridge structure that is adjacent to your property, and is specifically for property owners close to the proposed work.

Petition for Appointment of a Board of View, Exhibit A; Original Record, Item No. 2, at 8 (emphasis in original).

PennDOT notified Condemnees by letter that it "is acquiring the property that you occupy in connection with the referenced highway project." S.R.R. 70b. PennDOT's letter stated that "when the time approaches, a representative of [PennDOT] will inform [Condemnees] of the date the property will be needed" and that they would receive written notice of "the date by which [they] must move." *Id*. The letter also stated that Condemnees would be provided relocation assistance "to help [them] find a suitable replacement property." *Id*.

On June 23, 2020, Condemnees filed a petition for the appointment of a board of viewers, alleging a *de facto* taking under Section 502(c) of the Eminent Domain Code, 26 Pa. C.S. §502(c).[3] Condemnees' claim for damages was based on allegations that PennDOT's project rendered them "unable to acquire personal property which would be stored on the [] [P]roperty"; diminished the fair market value of the Property; and constituted a taking of the Property for a new construction project. Petition, ¶13; Original Record, Item No. 2, at 5.

---

[3] It states:

(c) Condemnation where no declaration of taking has been filed.--

(1) An owner of a property interest who asserts that the owner's property interest has been condemned without the filing of a declaration of taking may file a petition for the appointment of viewers substantially in the form provided for in subsection (a) setting forth the factual basis of the petition.

(2) The court shall determine whether a condemnation has occurred, and, if the court determines that a condemnation has occurred, the court shall determine the condemnation date and the extent and nature of any property interest condemned.

(3) The court shall enter an order specifying any property interest which has been condemned and the date of the condemnation.

(4) A copy of the order and any modification shall be filed by the condemnor in the office of the recorder of deeds of the county in which the property is located and shall be indexed in the deed indices showing the condemnee as grantor and the condemnor as grantee.

26 Pa. C.S. §502(c).

4

On July 1, 2020, the trial court granted Condemnees' petition and found that a *de facto* taking of the Property occurred on May 14, 2020, and appointed a board of viewers. On July 8, 2020, PennDOT filed a motion to vacate the trial court's July 1, 2020, order, stating that it held a valid aerial and surface easement and that all construction work was being done within the confines of that easement. On July 21, 2020, PennDOT filed preliminary objections to Condemnees' petition.

On July 28, 2020, the trial court vacated its July 1, 2020, order. It further ordered PennDOT to file a response to the petition for appointment of a board of viewers by August 10, 2020, noting that PennDOT had filed preliminary objections on July 21, 2020.[4] On August 7, 2020, PennDOT filed an answer to Condemnees' petition.

A hearing was held on Condemnees' petition and PennDOT's preliminary objections. The parties presented testimony and documentary evidence.

On behalf of PennDOT, Roger Joseph, Right-of-Way Administrator for District 6, testified that in 1972, PennDOT filed a declaration of taking in connection with the I-95 Betsy Ross Interchange that included the easement over the Property. Joseph explained that a declaration of taking of the Property was not filed for the current I-95 project because PennDOT's work will take place within the existing easement on the Property.

Anna McKenna, one of the Condemnees, acknowledged that the overpass crossing the rear of the Property existed when she and her husband purchased the Property in 2007. She testified that PennDOT's current project constitutes new construction and not reconstruction, and it has caused the value of their Property to decline.

---

[4] PennDOT had filed its preliminary objections under Control No. 20071797. It was directed to file its response to the petition under Control No. 20061778.

McKenna testified about several photographic exhibits. Exhibit No. 5 showed Condemnees' inground swimming pool prior to PennDOT's construction on the overpass. Exhibit No. 6 showed the pool during construction with stones, dirt, and debris that damaged the pool liner. Exhibit No. 7 showed the back fence on the Property that PennDOT removed for the construction project. Exhibit No. 7 also showed a mound of dirt and 40-foot poles. Exhibit No. 8 showed that part of the Property taken for construction.

McKenna attempted to introduce and testify about Exhibit No. 9, a photograph of PennDOT's construction activity, but PennDOT objected to this evidence on grounds of relevancy. It pointed out that there was no dispute that the construction was taking place; however, that construction activity was limited to the boundaries of PennDOT's existing easement. Condemnees responded that they were "attempting to show that there's not reconstruction, that there's construction that went on here." Notes of Testimony, 1/12/2021, at 39 (N.T. __); Reproduced Record at 17a (R.R. __). The trial court sustained the objection, explaining that evidence of the impact of the current project was irrelevant to whether PennDOT's construction activities were authorized by its 1972 easement.

On cross-examination, McKenna acknowledged that she has not had the Property appraised since PennDOT began construction on the I-95 Betsy Ross Interchange. Although she claimed that the *de facto* taking of the Property occurred on May 14, 2020, the date of PennDOT's letter stating that it was "acquiring the Property that you occupy," S.R.R. 70b, McKenna admitted that she was continuing to use the easement area of the Property as of June 2, 2020.

Din Abazi, Assistant Bridge Engineer for District 6, testified as a certified bridge safety inspector and a professional engineer. He reviewed the

6

inspection, repairs, and maintenance records for the portion of I-95 located over Condemnees' Property, noting that since completion of the Betsy Ross Interchange, PennDOT entered onto the Property at least every two years to wash the concrete surfaces. It has also made repairs in the past.

Paul Shultes, a design project manager for District 6, testified. He explained that aerial easements were used for the construction of I-95 from Center City to Bucks County because the highway is elevated. Shultes focused on the language of the easement, which states: "No interference shall be made with the right which is in the Commonwealth of Pennsylvania to enter upon the property beneath the area affected by the aerial easement for the purpose of inspection, maintenance, repairs, reconstruction, or alteration of the structure and other appurtenances." N.T. 74; R.R. 26a. Shultes explained that this provision gave PennDOT the right to enter upon the easement area on the Property at any time to inspect the bridge, maintain the bridge, perform repairs, and reconstruct the bridge.

Shultes explained the difference between reconstruction and new construction. He testified that "reconstruction" encompasses "replacement;" by contrast, new construction is building something that had never been there before. N.T. 74-75; R.R. 26a. Because PennDOT is rebuilding an existing bridge, of the same size and in the same place, its work constitutes reconstruction.

On cross-examination, Shultes agreed that the original bridge over Condemnees' Property has been "at least partially demolished" and "might be all gone at this time." N.T. 77; R.R. 27a. However, the new bridge deck – or the part that is in the air – will occupy the same space relative to the Property. The supporting piers are in slightly different locations but within the easement area.

7

Finally, Amy Tracey, of Century Engineering, testified that she is responsible for right-of-way acquisitions, relocations, and right-of-way research for the I-95 project. She has been involved in the "relocation of personal property" from Condemnees' Property that is located in the aerial easement area. N.T. 80; R.R. 27a. Part of a fence in the aerial easement was removed as personal property, even though it had been placed in concrete. She explained that PennDOT's work does not require a condemnation of any of the Property, only a use of PennDOT's existing easement.

On January 25, 2021, the trial court dismissed Condemnees' petition for the appointment of a board of viewers.

In its PA. R.A.P. 1925(a) opinion, the trial court explained that PennDOT was acting in accordance with its 1972 easement because the current construction is confined to its existing easement area, which encompasses reconstruction, repairs, and maintenance.

As to Condemnees' argument that the 1972 temporary construction easement had expired, the trial court noted that it did not matter because PennDOT has the right under its permanent easement to undertake its current project on the Property. It further observed that the recorded plans also state that *"moveable items may have to be removed by the owner during some or all of the previously mentioned operations."* Trial Court Op. at 7 (emphasis added). PennDOT's right to access the easement area, which is absolute, eliminated any need for a temporary construction easement.

The trial court rejected Condemnees' contention that because exceptional circumstances have deprived them of the use and enjoyment of their Property, their petition for the appointment of a board of viewers should be granted.

8

The trial court concluded that Condemnees had not been substantially deprived of the use and enjoyment of that part of their Property not burdened by the easement.

Finally, the trial court addressed Exhibit No. 9, a photograph of Condemnees' backyard that was denied admission. Condemnees had testified extensively about three similar exhibits. Condemnees asserted that Exhibit No. 9 was offered to show that PennDOT's highway project was new construction, not reconstruction; however, extensive testimonial and photographic evidence had been presented on this issue. Even if Exhibit No. 9 could be viewed as relevant evidence, the trial court concluded that it was cumulative of other evidence.

## Appeal

On appeal,[5] Condemnees raise four issues, which we reorder and summarize as follows. First, Condemnees argue that PennDOT's highway improvement project has effected a *de facto* condemnation of the Property because it is engaged in new construction that does not fall within the bounds of the 1972 easement. Second, Condemnees argue that regardless of whether this construction is "new," PennDOT has effected a *de facto* condemnation by failing to secure a temporary construction easement over the Property in light of the expiration of the 1972 temporary construction easement. Third, Condemnees argue that PennDOT's actions have substantially deprived them of the use and enjoyment of the Property not burdened by the easement, and, as a result, a board of viewers must determine their compensation damages. Fourth, Condemnees argue that the trial court erred in excluding Exhibit No. 9 from evidence.

---

[5] "In eminent domain cases, this Court reviews whether the trial court committed an abuse of discretion or an error of law. When an appeal presents a question of law . . . our scope of review is plenary." *In re: Condemnation of Land in Bristol Township*, 238 A.3d 585, 588 n.3 (Pa. Cmwlth. 2020) (quoting *Fuller v. Lehigh-Northampton Airport Authority*, 172 A.3d 1166, 1169 n.1 (Pa. Cmwlth. 2017)).

9

**Applicable Legal Principles**

Section 502(c) of the Eminent Domain Code permits a property owner to petition for the appointment of a board of viewers to seek compensation for an injury to property where no declaration of taking has been filed. 26 Pa. C.S. §502(c). A "*de facto* taking" occurs when an entity clothed with the power of eminent domain has, by some activity, substantially deprived an owner of the beneficial use and enjoyment of his property. *Genter v. Blair County Convention and Sports Facilities Authority*, 805 A.2d 51, 55 (Pa. Cmwlth. 2002). A property owner alleging a *de facto* taking must prove the following elements:

> (1) [the] condemnor has the power to condemn the land under eminent domain procedures; (2) exceptional circumstances have substantially deprived the property owner of the use and enjoyment of the property; and (3) the damages sustained were the immediate, necessary, and unavoidable consequences of the exercise of the power of eminent domain.

*Matter of Franklin Township Sewage Authority*, 233 A.3d 1014, 1021 (Pa. Cmwlth. 2020) (quoting *Griffith v. Millcreek Township*, 215 A.3d 72, 75 (Pa. Cmwlth. 2019)).

"Easements are construed under the same principles of interpretation that apply to other contracts." *Lancaster County Agricultural Preserve Board v. Fryberger*, 257 A.3d 192, 202 (Pa. Cmwlth. 2021). "If there is any doubt as to the meaning of a term, it should be construed to have a reasonable meaning in accord with the intention of the parties." *Id.* To ascertain that intention, the court must "consider the circumstances, the situation of the parties, the objects they have in mind and the nature of the subject matter of the contract . . . ." *Id.* (quoting *Sigal v. Manufacturers Light & Heat Company*, 299 A.2d 646, 649 (Pa. 1973)). Interpretation of an easement agreement is a question of law; therefore, we consider the easement through a standard of review that is *de novo* and a scope of review that

is plenary. *Morell v. Department of Transportation* (Pa. Cmwlth., No. 625 C.D. 2021, filed December 28, 2022) (unreported), slip op. at 9.[6]

With these principles in mind, we address Condemnees' issues *seriatim*.

## Analysis

### I. Scope of the 1972 Easement

In their first issue, Condemnees argue that the 1972 declaration of taking did not authorize new construction. Rather, the declaration covers only maintenance, repair, painting, reconstruction, or alteration of the existing structure or appurtenances. Condemnees Brief at 13. Here, PennDOT is constructing new piers and in different locations on the Property; this activity cannot be termed either a reconstruction or an alteration that falls within the language of the existing 1972 easement.

PennDOT responds that it has acquired the right to "enter upon the [Property] beneath the area affected by the aerial easement, for the purpose of . . . maintenance, repairs, reconstruction or alteration of the structure and other appurtenances." PennDOT Brief at 16 (quoting S.R.R. 35b-62b). The present construction project constitutes reconstruction, repairs and maintenance of the bridge, as correctly held by the trial court.

This Court considered this issue in *Morell* (Pa. Cmwlth., No. 625 C.D. 2021, filed December 28, 2022). The Morells' property, also located on East Juniata Street, was burdened by the same aerial and surface easement acquired in 1972 to construct the I-95 Betsy Ross Interchange. When the Morells learned of PennDOT's project to improve the highway ramp that crossed their property, they filed a petition

---

[6] An unreported panel decision of this Court, "issued after January 15, 2008," may be cited "for its persuasive value[.]" Section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code §69.414(a).

for the appointment of a board of viewers, asserting that PennDOT's project went beyond the scope of its easement and, thus, constituted a *de facto* condemnation of their property. PennDOT filed preliminary objections, asserting that its project was taking place within the bounds of the easement it had previously acquired and would not substantially deprive the Morells of the use of their property. Following a hearing, the common pleas court sustained PennDOT's preliminary objections and dismissed the petition for appointment of a board of viewers.

On appeal, the Morells asserted, *inter alia*, that PennDOT's highway improvement project did not fall within the bounds of the 1972 easement that was established by the same 1972 declaration of taking we consider here. It states:

> (5) No interference shall be made with the right which is in the Commonwealth of Pennsylvania, to enter upon the [p]roperty beneath the area affected by the aerial easement, for the purpose of inspection, maintenance, repairs, *reconstruction or alteration of the structure* and other appurtenances.

*Morell*, slip op. at 2-3 (quoting Declaration of Taking) (emphasis added). Thus, the critical issue was whether PennDOT's new ramp constituted "reconstruction" within the meaning of the 1972 declaration of taking. Because "reconstruction" was not defined in the declaration, this Court looked to the ordinary meaning of the word as including "the act or process of rebuilding, repairing, or restoring something." *Morell*, slip op. at 10 (quoting *Reconstruction*, Merriam-Webster.com. https://www.merriam-webster.com/dictionary/reconstruction (last visited May 21, 2022)). We agreed with PennDOT that the new highway ramp and its appurtenances, including the replacement of existing support piers on the Morells' property, constituted reconstruction. The placement of the new support pier in a different location did not change this result because all construction will take place within the easement area of the Morells' property.

12

*Morell* is persuasive, and we follow its analysis here. In 1972, PennDOT acquired aerial and surface easements over Condemnees' Property to construct a highway ramp along with the right to inspect, maintain, repair, reconstruct, and alter that ramp. S.R.R. 74b. The project to replace the original piers with new piers in a different location within the easement constitutes reconstruction. We conclude that the trial court correctly determined that PennDOT is engaged in a reconstruction project that falls within the scope of the 1972 easement.

## II. Temporary Construction Easement

In their second issue, Condemnees argue that, regardless of whether this construction is "new," PennDOT has effected a *de facto* condemnation by failing to secure a temporary construction easement while it replaces the original highway ramp.[7] The original temporary construction easement has, by its very terms, expired. Condemnees contend that PennDOT needed to obtain a new construction easement before it undertook the current project.

"A temporary construction easement is generally acquired in conjunction with a permanent acquisition and often abuts the boundaries of the permanent acquisition." Joseph T. Waldo and Paul H. Avery, *Eminent Domain and Land Valuation Litigation, Temporary Takings*, SK045 ALI-ABA 203, 222 (2005). "The permanent acquisition area is used for permanent placement of the public improvement, whereas the [temporary construction easement] is used in addition to the permanent acquisition area for initial construction of the public improvement." *Id*. A temporary easement is similar to "renting the ground." *See generally Condemnation of Permanent and Temporary Rights of Way for Transportation of Natural Gas in Buffalo Township* (Pa. Cmwlth., No. 1093 C.D. 2017, filed June 13,

---

[7] PennDOT's inartful May 14, 2020, letter to Condemnees is not relevant to the legal question of whether PennDOT's project requires a new temporary construction easement.

2018) (unreported). Where there is a dispute, the board of viewers sets the damages according to the fair rental value of the land used during the period of construction. *See generally Department of Transportation v. Peoples Bank of Glen Rock*, 961 A.2d 911 (Pa. Cmwlth. 2008).

In *Morell*, we explained that a permanent easement includes an implicit right of access to the easement area whenever needed to carry out the purpose of the condemnation. *Morell*, slip op. at 10 (citing *Edgett v. Douglas*, 22 A. 868 (Pa. 1891)). Here, PennDOT has an express right of access to conduct a reconstruction of the piers within the 1972 easement area. PennDOT is not using any land in this project save that which falls within its easement. It cannot be required to pay rent to use land it already owns so long as this use falls within the parameters of its recorded property interest.

It is not clear why PennDOT acquired a temporary construction easement in 1972 in addition to a permanent easement. It can only be inferred that during the initial construction, it used land that fell outside the permanent easement area. That is not the case today.

### III. *De Facto* Condemnation

In their third issue, Condemnees argue that the trial court erred in dismissing their petition for the appointment of a board of viewers because they established that the project has substantially deprived them of the use and enjoyment of the Property, and, further, the damages sustained were immediate, necessary, and unavoidable consequences of PennDOT's exercise of its eminent domain power. As explained by McKenna, PennDOT has taken "half of [their] yard" and there is "dirt all over the patio." N.T. 44; R.R. 18a. As a result, Condemnees cannot use their "yard for picnics or barbecues." *Id*. They cannot use their pool because it is "filled

with mud" and the "liner is damaged." *Id*. Similarly, dirt from the construction ruined their patio doors; caused a crack in the deck; and the back fence, which had been cemented in the ground, was removed.

PennDOT responds that Condemnees have not proven a *de facto* taking. During the construction, the Property has remained in continuous use as Condemnees' primary residence, and they have produced no evidence to support their claim that PennDOT's project has reduced the value of their Property.

A *de facto* taking occurs "when an entity clothed with the power of eminent domain has, by even a non-appropriative act or activity, substantially deprive[d] an owner of the beneficial use and enjoyment of his property." *Genter*, 805 A.2d at 55. A substantial deprivation is one where the condemning body has: (1) deprived the owner of the use and enjoyment of his property, or (2) subjected the owner to the loss of the property. *Department of Transportation v. Steppler*, 542 A.2d 175, 177 (Pa. Cmwlth. 1988). The beneficial use of a property includes not only its present use, but also all potential uses including its highest and best use. *Visco v. Department of Transportation*, 498 A.2d 984, 986 (Pa. Cmwlth. 1985).

Here, the highest and best use of the Property is as a residence, and Condemnees have continued to use the Property as a residence throughout PennDOT's project. "[W]here there is no substantial deprivation of the property's highest and best use, there can be no *de facto* taking." *Steppler*, 542 A.2d at 178. As for the debris in the pool, McKenna explained that until PennDOT erected a "cyclone fence," or "the black fence[,]" "[t]hat's how all the debris got in our pool." N.T. 36; R.R. 16a. This suggests that once the black fence was installed, debris ceased to enter the pool. Moreover, having a household inconvenienced by a construction project does not constitute the type of exceptional circumstances

15

needed to prove a *de facto* taking of a residential property. *Steppler*, 542 A.2d at 178. A substantial deprivation requires more than the temporary incursion of dirt and debris onto the property. *In re Condemnation by the Department of Transportation of Certain Property in the Borough of Bellevue*, 827 A.2d 544 (Pa. Cmwlth. 2003) (temporary incursion of water, snow and ice and vibration did not rise to the level of a substantial deprivation of use).

Here, there is no evidence that the Property was rendered uninhabitable by the project or that PennDOT has located equipment on the Property outside the area of the aerial and surface easement. Documentation of construction dust and dirt does not constitute a substantial deprivation of use. "Generally, where a landowner suffers specific damage to his property as a result of negligent acts of a party with the power of eminent domain, the proper action lies in trespass." *Poole v. Township of District*, 843 A.2d 422, 424 (Pa. Cmwlth. 2004). *See also In re Condemnation by the Department of Transportation of Right-of-Way for State Route 1032, Section B02, in the Borough of Rochester*, 137 A.3d 666, 672-73 (Pa. Cmwlth. 2016) (claims for damages arising from damage to fences, gates, curbing, and walls lie in trespass).

Condemnees may, or may not, have a trespass claim for damages arising from PennDOT's project. We conclude, as did the trial court, that Condemnees did not prove a *de facto* condemnation.

### IV. Exhibit No. 9

In their final issue, Condemnees argue that the trial court erred in sustaining PennDOT's objection to Exhibit No. 9 because this photograph shows "how new construction was occurring on the [P]roperty, not merely reconstruction." Condemnees Brief at 24 (quoting R.R. 17a). PennDOT responds that the trial court properly sustained its objection to Exhibit No. 9 because Condemnees had already

16

been questioned about three similar exhibits offered as photographic evidence of their backyard and the surrounding construction. Exhibit No. 9 was simply cumulative and irrelevant.

Exhibit No. 9 was offered to show that PennDOT was engaged in "new" construction. However, Exhibit No. 9 was cumulative of other evidence. We discern no error in the trial court's evidentiary ruling. *Commonwealth v. Hoover*, 107 A.3d 723, 729 (Pa. 2014) (appellate courts generally defer to the trial court because "the admissibility of evidence is within the discretion of the trial court, and such rulings will not form the basis for appellate relief absent an abuse of discretion").

## Conclusion

We discern no error in the trial court's holding. PennDOT's reconstruction of the I-95 Betsy Ross Interchange is confined to the area of its preexisting aerial and surface easement, which PennDOT has a right to access without limitation. Accordingly, we affirm the order of the trial court.

_____
MARY HANNAH LEAVITT, President Judge Emerita

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Harry and Anna Marie McKenna, :
               Appellants :
                :
               v. : No. 581 C.D. 2021
                :
Commonwealth of Pennsylvania, :
Department of Transportation :

## **O R D E R**

AND NOW, this 25th day of June, 2024, the January 25, 2021, order of the Court of Common Pleas of Philadelphia County, in the above-captioned matter, is AFFIRMED.

_____
MARY HANNAH LEAVITT, President Judge Emerita